THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br><br>JAMES GARTH, BARBARA WILMOTH,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS**<br><br><br>Case No. 2:20-cr-00272-DBB<br><br>District Judge David Barlow |

Before the court are Defendant James Garth's ("Mr. Garth") and Defendant Barbara Wilmoth's ("Ms. Wilmoth") Motions to Suppress.[1] On April 14, 2021, the court conducted an evidentiary hearing on the motion.[2] On July 8, 2021, the court heard oral argument on the motion.[3] After thorough review and consideration of the memoranda submitted by the parties, the testimony and evidence presented at the evidentiary hearing, and the oral argument presented by counsel, the court renders the following Memorandum Decision and Order.

## FINDINGS OF FACT[4]

This case involved a traffic stop that was part of a traffic enforcement interdiction project on Interstate 80.[5] On August 11, 2020, Trooper Jenson was positioned near mile marker 65 and

---

[1] Motion to Suppress & Request for Hearing, ECF No. 56, filed December 28, 2020; Motion to Suppress and request for in-person evidentiary hearing and for oral argument, ECF No. 57, filed December 30, 2020; *see also* Memorandum in Support of Motion to Suppress, ECF No. 75, filed May 18, 2021. Ms. Wilmoth joined Mr. Garth's arguments in support of the motion. *See* Order Granting Motion for Joinder, ECF No. 81, filed July 8, 2021.

[2] *See* Minute Entry for Evidentiary Hearing, ECF No. 68.

[3] *See* Minute Entry for Motion Hearing, ECF No. 80.

[4] The following set of facts are based on the transcript of the evidentiary hearing held on April 14, 2021 (hereinafter, "Tr."), as well as video evidence admitted as Government Exhibit 1 (hereinafter, "Video, Exh. 1").

[5] The purpose of the three-day interdiction project was, "[i]nterdicting criminals." Tr. 18:9-13.

facing west as he saw a silver pickup truck traveling eastbound.[6] The truck was pulling a flatbed trailer which held a BMW car; the BMW was topped with a plastic tote.[7] None of the vehicles had license plates.[8] Jensen estimated that the truck was traveling at 90 miles per hour ("MPH"), where the speed limit was 80 MPH.[9] His radar unit indicated 89 MPH.[10] At this point, Jensen turned his vehicle around, flipped on his lights, and effectuated a traffic stop of the speeding pickup truck.[11]

At 9:44 a.m.,[12] Trooper Jenson approached the truck on the passenger side.[13] Inside he saw two people: a female in the driver's seat (later identified as Defendant Barbara Wilmoth) and a male in the passenger seat (later identified as Defendant James Garth).[14]

At 9:45 a.m., Ms. Wilmoth produced her driver's license.[15] While taking down Ms. Wilmoth's information, Trooper Jenson paused to ask who owned the truck.[16] Mr. Garth said that it belonged to his friend Tim, who was in the process of registering it in Oregon, but that there was a backlog due to COVID-19.[17]

---

[6] Tr. 18:1-7, 19.

[7] Tr. 20:9-17.

[8] Tr. 27:20-23.

[9] Tr. 20:1-7.

[10] *Id.*

[11] Tr. 20:9-17.

[12] The times listed throughout this Order are taken from the time stamp on Trooper Jensen's body-cam footage. *See* Video, Exh. 1 at 9:44:58 a.m.

[13] Video, Exh. 1; *see also* Tr. 28.

[14] *Id.*

[15] Video, Exh. 1 at 9:45:17 a.m.

[16] *Id.* at 9:45:24 a.m. Normal protocol was for a trooper to physically take the driver's license, however, COVID protocol required Jensen to write down the information onto a notepad; this occurred again with Mr. Garth's license as well as with the other vehicle paperwork. Tr. 34:10-14.

[17] Tr. 28:17-29; *see also* Video, Exh. 1 at 9:45:30 a.m.

At 9:46 a.m., while writing down Ms. Wilmoth's information, Jensen asked if the California address on Wilmoth's license was current; she said, "yes."[18] Jensen then asked about their destination and purpose of travel.[19] Mr. Garth explained that they were going to Salt Lake City to deliver the BMW on the trailer, and that the trailer belonged to him but was not registered.[20] Jensen then asked for proof of insurance for the truck.[21]

At 9:47 a.m., while Garth looked for paperwork, Jensen asked Ms. Wilmoth if she was aware of her speed.[22] Wilmoth said it was just below 90 MPH; Jensen confirmed it was 89 MPH.[23] Jensen later testified that the lack of license plates alone would have justified the stop.[24]

At 9:48 a.m., Mr. Garth provided proof of insurance on the truck.[25] The insurance for the truck was current; Trooper Jensen wrote down the VIN that was printed thereon.[26]

At 9:49 a.m., Jensen asked, "if you guys live in California, how'd you get his truck in Oregon?"[27] Garth said that "he went and got it for a job."[28] Garth explained that he could not find paperwork for the BMW, but said he had a title for it.[29] Garth provided Jensen with his driver's license, which Jensen copied down on his notepad.[30]

---

[18] Video, Exh. 1 at 9:46:10 a.m.

[19] *Id.* at 9:46:14 a.m.

[20] Tr. 29:13-18.

[21] Tr. 30:3; *see also* Video, Exh. 1 at 9:46:48 a.m.

[22] Video, Exh. 1 at 9:47:00 a.m.

[23] *Id.* at 9:47:11 a.m.; Tr. 30:14-21.

[24] Tr. 30:24-31:1; Tr. 33:3-5.

[25] Video, Exh. 1 at 9:48:06 a.m.; Tr. 30.

[26] Tr. 32:6-7.

[27] Video, Exh. 1 at 9:49:03 a.m.

[28] Tr. 32:10-12; Video, Exh. 1 at 9:49:10 a.m.

[29] Tr. 32:19-22; Video, Exh. 1 at 9:50:00 a.m.

[30] Video, Exh. 1 at 9:49:25 a.m.; Tr. 32:19-20.

At 9:50 a.m., Jensen asked where in Salt Lake they were delivering the BMW.[31] Garth replied that he "hadn't pulled the address up yet."[32] Jensen testified that he found this suspicious since they were less than an hour away from Salt Lake City.[33] At this point, Jensen thought he might "have a possible stolen vehicle."[34] He also took note of the plastic tote on the roof of the BMW because in the past he had seized contraband from such cargo carriers.[35] At 9:50:17 a.m., Garth began searching for the address in his phone,[36] sitting back and holding the phone at an angle that Jensen would not be able to see.[37] At 9:52:36 a.m., over two minutes later, Garth produced an address: "1748 D Street South Tahoe."[38] Jensen believed this was a false address because of how long it took to find and because Jensen believed a normal Utah address would be something more like "1748 North, South, East, West D Street," reflecting Utah's grid-like system.[39] This raised Jensen's suspicion, and indicated that "they didn't want me to know their destination."[40]

At 9:53 a.m., Trooper Jensen returned to his patrol vehicle.[41] At 9:57 a.m., Jensen requested a driver's license check for Mr. Garth, which returned valid at 9:59 a.m.[42] At 10:01

---

[31] Tr. 31:2-12.

[32] Tr. 35:9-10; Video, Exh. 1 at 9:50:07 a.m. ("Where at in Salt Lake?").

[33] Tr. 35:10-11.

[34] Tr. 33:19-23.

[35] Tr. 34:6-18.

[36] Video, Exh. 1 at 9:50:17 a.m. (showing Garth pull out his phone to search for the address).

[37] Tr. 35:7-22; Video, Exh. 1 at 9:50:27 a.m. (showing Garth holding phone at an angle, away from Trooper Jensen).

[38] Tr. 35:12-18; Video, Exh. 1 at 9:52:36 a.m.

[39] Tr. 36:6-12; Tr. 37:17-22; *see also* Video, Exh. 1 at 9:52:50 (Jensen repeating back, "South Tahoe?").

[40] Tr. 37:17-22.

[41] Video, Exh. 1 at 9:53:25 a.m.

[42] *Id.* at 9:57:11 a.m.; *id.* at 9:59:10 a.m.

a.m., Jensen returned to the truck to confirm its VIN.[43] Jensen also asked Mr. Garth again who

owned the truck.[44] Garth again provided a name and a phone number.[45] Jensen informed Garth

that the truck was not in the process of being registered, based on his query.[46]

At 10:04 a.m., Jensen returned to his patrol vehicle,[47] ran the VIN a second time, and

then completed a citation for Ms. Wilmoth.[48] At 10:09 a.m., Jensen printed the citation, returned

to the truck, and explained to Ms. Wilmoth that he was citing her for speeding and a vehicle

registration violation.[49]

At 10:10 a.m., Jensen resumed questioning Garth about the BMW before handing the

citation to Wilmoth at 10:11 a.m.[50] Jensen testified he extended the detention "[t]o make sure

that the BMW was not stolen," and agreed "that is the intent to try and gain reasonable

suspicion."[51] Jensen asked who owned the BMW and whether he had access to the plastic tote on

top of the BMW.[52] Garth said it did not belong to him, it was going to a business, and that he did

---

[43] Video, Exh. 1 at 10:01:11 a.m.

[44] *Id.* at 10:02:31 a.m. ("Whoever owns it is registering it in Oregon?"); *see also id.* at 10:02:34 a.m. ("Do you have a name for [the owner] and a phone number?").

[45] *Id.* at 10:02:37 (providing the name of the owner); *id.* at 10:03:29 (providing the phone number).

[46] Video, Exh. 1 at 10:03:01 a.m. ("I've ran it through . . . and it doesn't show that it's anywhere in the process [of being registered]."); Tr. 38:3-13.

[47] Video, Exh. 1 at 10:04:13 a.m.

[48] Tr. 39:14-17.

[49] Video, Exh. 1 at 10:09:18 a.m. (printing citation); *id.* at 10:09:48 a.m. (returning to the truck); *id.* at 10:09:52 a.m. (explaining the citation to Ms. Wilmoth).

[50] *Id.* at 10:11:26 a.m. (showing Trooper Jensen hand Ms. Wilmoth the citation).

[51] Tr. 84:1-7.

[52] *Id.*; Video, Exh. 1 at 10:10:40 a.m. ("Whose car is that? Does that belong to you, James?"); Video, Exh. 1 at 10:11:23 a.m. ("Do you have access to the tote on top?").

not have keys to the tote or the car.[53] Jensen responded, "let's go back and look at the car [to] see if we can find a VIN number on it."[54]

At 10:12 a.m., Garth tried three times to read Jensen the BMW's VIN number, but was "unable to provide the correct VIN number," so Jensen recorded the number himself.[55] Jensen testified that Garth's inability to read the VIN number was indicative of "nervous" behavior, based on his training and experience.[56] Jensen found the plastic tote was suspicious because Garth said he did not have the keys to it, and it appeared to be "of newer condition" compared to the damaged condition of the BMW.[57] Jensen also found it suspicious that Garth did not have the key to the car that was being sold.[58]

At 10:13 a.m., Jensen asked Garth if he could "jump up and look at" the plastic tote.[59] Garth said, "sure."[60] Jensen stepped up on the trailer, confirmed the tote was locked, but was able to stick his hand in between the lids, and felt an object inside.[61] Jensen "found [it] suspicious as if the car was being sold for parts and there was a topper that had belongings inside of it."[62]

At 10:14 a.m., Jensen told Garth to "hang out right here for a second," and walked back to his patrol car.[63] Jensen then requested that Trooper West and Sergeant Wood respond, because

---

[53] Tr. 41:10-20.

[54] Video, Exh. 1 at 10:11:26 a.m.; Tr. 84:8-15.

[55] Tr. 43:1-10; Video, Exh. 1 at 10:12:01 a.m.

[56] Tr. 43:13-17.

[57] Tr. 44: 2-8.

[58] Id. at 16-17.

[59] Video, Exh. 1 at 10:13:31 a.m.

[60] Id. at 10:12:32 a.m.

[61] Tr. 44:25-45:5.

[62] Tr. 45:17-19.

[63] Video, Exh. 1 at 10:14:01 a.m.; Tr. 45:21.

"[a]t this time I believe[d] I had criminal activity taking place."[64] Jensen elaborated, "I didn't know if it was a stolen vehicle. I didn't know if there was illegal substances being transported. I was not aware of any of what was actually taking place at all."[65]

Sgt. Wood estimated that he was "probably 20 miles away."[66] While Jensen waited for Sgt. Wood, he ran the VIN for the BMW and found that it was not stolen, but that its title was transferred to Garth in 2015.[67] This was inconsistent with Garth's previous statements that the BMW did not belong to him and that he did not have keys to the BMW.[68]

At 10:17 a.m., after Trooper Jensen gestured to Garth from his patrol vehicle to walk towards him, Garth responded, "I was gonna go sit down."[69] Jensen said, "just one second" and continued to question Garth.[70] Jensen asked who was paying him to deliver the vehicle.[71] Garth said he did not know, but then seconds later gave a name, "Brittany Keen," and provided a phone number.[72] Jensen also asked how much he was being paid, and Garth repeated, "$500."[73] Jensen believed Mr. Garth was telling him "a false story" because "nothing that he had told me from the beginning was matching up to what was at hand."[74]

---

[64] Tr. 45:21-46:1.

[65] Tr. 46:4-7.

[66] Tr. 122:9-12. Sgt. Wood would later arrive on the scene at 10:33 a.m. *Id.*

[67] Tr. 85:5-23.

[68] Tr. 46:22-47:2.

[69] Video, Exh. 1 at 10:17:03 a.m.

[70] *Id.* at 10:17:09 a.m. ("You don't know who paid you for the car?").

[71] *Id.*; Tr. 47:5-10.

[72] Video at 10:17:14 a.m.

[73] Tr. 47:13-21; Video, Exh. 1 at 10:18:52 a.m.

[74] Tr. 48:1-4.

At 10:18 a.m., Jensen asked Garth again for the BMW's delivery address, and Garth said, "I don't remember the address" and that "it's in the car."[75] Jensen found this "very suspicious" because Garth had previously retrieved the address from his phone, which was still in his hand.[76] Around this time, Trooper Jerome arrived.[77]

At 10:20 a.m., Jensen searched Garth to make sure he did not have any weapons.[78] As Jensen prepared to deploy his canine "Drago" for an exterior sniff of the vehicle,[79] he told Mr. Garth to get Garth's dog out of the truck bed because, "I don't want [your] dog coming out while I'm running mine;" "you're gonna go stand up the road while I run my dog."[80] Jensen also had Ms. Wilmoth exit the vehicle and stand well away from the car.[81]

Trooper Jensen testified to a number of facts on which he based his suspicion of criminal activity leading to the canine sniff: the truck was an unregistered vehicle pulling an unregistered trailer which had an unregistered vehicle on the back;[82] the truck "was a third-party vehicle, which due to training and experience was a possible indicator of criminal activity;"[83] the plastic tote on top of the BMW was "very suspicious to [Jensen] to begin with;"[84] the unusual nature of the address and Garth's subsequent failure to confirm the address;[85] Jensen eventually determined via Google search that the address provided by Garth as to their destination was a

---

[75] Tr. 48:4-6; Video, Exh. 1 at 10:18:52 a.m.

[76] Tr. 48:4-10.

[77] Video, Exh. 1 at 10:20:13 (showing Trooper Jerome).

[78] Video, Exh. 1 at 10:20:13; Tr. 48:22-49:9.

[79] Tr. 48:22-49:9.

[80] Video, Exh. 1 at 10:20:48 a.m.

[81] *Id.* at 10:22:13 a.m.

[82] Tr. 49:21-23.

[83] Tr. 49:23-50:1.

[84] Tr. 49:2-3.

[85] Tr. 50:24-25; Tr. 51:1-2.

false address;[86] Garth's nervousness when asked to provide the VIN for the BMW;[87] Garth had

told Jensen he did not own the BMW or have a key to it, which Jensen found to be false after

looking up the VIN number;[88] Jensen had felt that the tote had an object inside of it;[89] Garth told

Jensen he did not know to whom he was delivering the car or who paid him to do so, but then

within ten seconds provided a name and phone number;[90] and Garth's other inconsistent

statements.[91] While Jensen testified that he was suspicious a crime had been committed, he also

stated that he did not know what crime had been committed, only that he "just knew it was

criminal activity."[92]

      In his testimony, Trooper Jensen also described his training and experience as a canine

handler.[93] On the date of the traffic stop, both Trooper Jensen and his canine Drago had up-to-

date certification: Drago was certified by POST and Trooper Jensen was certified as a canine

handler.[94] Jensen had been Drago's handler since February of 2020.[95] In four deployments

during this interdiction project, Jensen deployed Drago four times, Drago gave positive

indications four times, but found illegal substances three times.[96] On the fourth time, the vehicle

---

[86] Tr. 50:6-7.

[87] *Id.*

[88] Tr. 50:14-16.

[89] Tr. 50:9-10.

[90] Tr. 50:21-24.

[91] Tr. 51:3-5.

[92] Tr. 49:10-14.

[93] Tr. 52- 53.

[94] Tr. 15:15-16; Tr. 54:19-24; Tr. 52:12-20; *see also* Gov. Ex. 2.

[95] Tr. 92:21.

[96] Tr. 54:3-15.

in question had recently been rented and it was unknown who had driven the vehicle prior to the current stop.[97] Prior to Trooper Jensen, Trooper Loveland had Drago for five years.[98]

At 10:23 a.m., Jensen deployed Drago, who started his sniff at the back of the trailer, then went up the left side of the trailer to the front of the pickup truck.[99] Jensen gave his command to find drugs, and Drago reversed his direction and started sniffing down the driver's side of the truck, down the left side of the trailer to the rear of the trailer.[100] At this point, Jensen noticed Drago alert to an odor.[101] Jensen defined "alert" as "behavior that not everybody would note, but me as a handler, knowing his behaviors, would know when he is in the odor."[102] Drago continued around the trailer and the truck, then "went in between the trailer and the truck, the tongue hitch."[103] At 10:25 a.m., Drago stopped at the pickup truck bumper, and Jensen said, "good boy, where is it?"[104] Then, "Drago put his front paws up on the bumper of the pickup truck and gave a positive indication" of "[i]llegal substances."[105] A "positive indication would be a behavior noted in the dog that somebody outside of the handler would recognize as him finding the odor."[106] Jensen described this behavior as a being "frozen in stature, staring at a certain

---

[97] Tr. 54:14-18.

[98] Tr. 93:4-6.

[99] Tr. 57:23-58:1; Video, Exh. 1 at 10:23:39 a.m.

[100] Tr. 58:1-7.

[101] *Id.*

[102] Tr. 59:21-23.

[103] *Id.*

[104] Video, Exh. 1 at 10:25:01 a.m.

[105] Tr. 61 :16-25; *see also* Video, Exh. 1 at 10:25:10 a.m.

[106] Tr. 59:8-10.

location where the odor is coming from."[107] At this point, Jensen said, "good boy, good boy," tossed Drago a toy,[108] and returned Drago to the patrol vehicle.[109]

At 10:26 a.m., Jensen returned to Ms. Wilmoth and Mr. Garth, and had them identify the belongings in the truck.[110] At 10:29 a.m., Trooper West had arrived, and he assisted Jensen in searching the cab of the pickup; in their search, they found a BMW key, a BMW title and registration, and keys on a key ring.[111] They then searched the bed of the truck, which had brand-new bolts attaching the worn gas tank to it, and tools with what appeared to be the same size of bolt attachments.[112] This suggested to Trooper Jensen that the fuel tank might have been recently replaced and that might have been the source of the odor to which the dog indicated.[113]

At 10:33 a.m., Sgt. Wood arrived.[114] At 10:35 a.m., Trooper Jensen briefed him, recounting that Drago "indicated on the truck," "alerted on the back part of the trailer" that held the BMW, "but he's having a hard time getting up on the trailer to get good sniff of the car."[115] Jensen asked whether he could search the BMW from the alert on the truck, and wondered if Wood wanted to deploy his canine, "Axel," out of an abundance of caution, not knowing the legalities of the situation.[116] At 10:36 a.m., Sgt. Wood agreed to run Axel for an additional sniff around the trailer and car.[117]

---

[107] Tr. 62:13-20.

[108] Video, Exh. 1 at 10:25:17 a.m.

[109] *Id.* at 10:25:41 a.m.

[110] *Id.* at 10:26:55 a.m.

[111] Tr. 63.

[112] Tr. 63:14-64:5.

[113] *Id.*

[114] *Id.*

[115] Video, Exh. 1 at 10:35:30 a.m.

[116] *Id.*; Tr. 64:6-16; Tr. 123:4-18.

[117] Video, Exh. 1 at 10:36:35 a.m..

At 10:37 a.m., Sgt. Wood ran Axel around the car.[118] At 10:38 a.m., Axel "jumped up on the trailer and gave a positive indication."[119] Wood was certified to be a canine handler in 2012, and Axel was certified in May 2020.[120] On cross-examination, Sgt. Wood was asked whether Axel ever wants his toy so bad that he might employ a confirmatory response for controlled substances but are actually for his toy.[121] Wood responded, "The dog is very reliable … I don't think is he going to try to cheat to get the toy, no."[122]

At 10:38 a.m., Trooper Jensen opened the trunk of the BMW, saw what was inside, and said, "let's hook him."[123] The trunk contained marijuana.[124] The plastic tote was also opened, and contained marijuana.[125] The officers moved the truck to their office; they later removed the fuel tank and found a built-in compartment which also contained marijuana.[126]

## STANDARD OF REVIEW

The Fourth Amendment guarantees the right of people to be "secure in their persons, houses, papers, and effects against unreasonable searches and seizures."[127] A traffic stop is a seizure for Fourth Amendment purposes, subject to the reasonableness requirement.[128] To determine the reasonableness of a traffic stop, the Tenth Circuit considers: (1) "whether the

---

[118] Video, Exh. 1 at 10:37:38 a.m.

[119] Tr. 64: 19-25.

[120] Tr. 115:14-15; 119.

[121] Tr. 131: 7-10.

[122] Tr. 131: 11-13.

[123] Video, Exh. 1 at 10:38:44 a.m.

[124] Tr. 66.

[125] *Id.*

[126] *Id.*

[127] U.S. Const. amend. IV.

[128] *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015); *see also Brendlin v. California*, 551 U.S. 249 (2007) (finding that both the driver and passenger are seized in a traffic stop for Fourth Amendment purposes).

officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[129] While "a lawful traffic stop may not extend beyond the time reasonably required to effectuate its purpose,"[130] continued detention is lawful if "the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity."[131]

Reasonable suspicion is "a particularized and objective basis for suspecting criminal conduct" under a totality of the circumstances.[132] While the government bears the burden of proving the reasonableness of an officer's suspicion, this is not meant to be an onerous standard.[133] Under the objective inquiry, courts ask "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate."[134] Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[135] Ambiguous behavior "susceptible of an innocent explanation" may still heighten a reasonable officer's suspicion and justify a detention to resolve the ambiguity.[136]

---

[129] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1307 (10th Cir. 2006) (internal quotation marks omitted).

[130] *Pettit* at 1379; *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

[131] *Pettit* at 1379; *United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005); *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

[132] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[133] *Rodriguez v. United States*, 575 U.S. 348, 358, 135 S. Ct. 1609, 1616–17, 191 L. Ed. 2d 492 (2015) *United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011); *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010).

[134] *Terry v. Ohio*, 392 U.S. 1, 21–22 (1868); *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011).

[135] United States v. Arvizu, 534 U.S. 266, 273 (2002).

[136] *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see also United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) ("[A]s long as [an officer] has a particularized and objective basis for suspecting an individual may be

## DISCUSSION

Defendants' Motion to Suppress asks the court to suppress the evidence obtained as a result of alleged constitutional violations of their Fourth Amendment rights.[137] Defendants make two main arguments. First, Defendants contend that Trooper Jensen unreasonably prolonged the detention with questioning unrelated to the reason for the stop,[138] continued to question after issuing a citation, and waited for a second K9, "despite having no objective basis to suspect the presence of controlled substances."[139] Second, Defendants contend that the two dog sniffs were not reliable.[140] Thus, Defendants argue, "all tangible and intangible evidence seized was the direct product of these Fourth Amendment violations and must be suppressed."[141]

### I.   Reasonableness of the Traffic Stop

The reasonableness of a traffic stop depends on (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[142] Here, the first issue is not in dispute. On August 11, 2020, Jensen saw a pickup truck traveling eastbound at a high speed.[143]

---

involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality.").

[137] Motion to Suppress & Request for Hearing, ECF No. 56, filed December 28, 2020; Defendants' Memorandum in Support of Motion to Suppress ("Motion"), ECF No. 75, filed May 18, 2021; *see also* Government's Response, ECF No. 76, filed June 9, 2021; Defendants' Reply to Government's Response ("Reply"), ECF No. 78, filed June 22, 2021.

[138] Motion at 2.

[139] *Id.*

[140] *Id.* at 19-23.

[141] Reply at 7; *see also* Motion at 24.

[142] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1307 (10th Cir. 2006) (internal quotation marks omitted).

[143] Tr. 20:9-17.

The speed limit was 80 miles per hour ("MPH").[144] Jensen's radar indicated 89 MPH.[145] In response, Jensen effectuated a traffic stop on the truck.[146] These facts justified Trooper Jensen's initial traffic stop.[147]

The second issue is whether Trooper Jensen's continued detainment of Defendants was reasonable. Defendants argue that Jensen failed to diligently pursue issuing a citation and impermissibly prolonged detainment.[148] In assessing the scope of a traffic stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation."[149] However, the standard is still "reasonableness—rather than efficiency."[150] Thus, the Tenth Circuit has found that it may be reasonable for an officer operating under the justification of the initial traffic violation to "inquire about the driver's travel plans" and "ask about matters unrelated to the stop," so long as the stop does not extend beyond the time reasonably required to effectuate its purpose.[151] Alternatively, if an "officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity" within this initial span of time independent from the traffic violation, "[c]ontinued detention is lawful."[152] Of course, the duration of the subsequent

---

[144] *Id.*

[145] Tr. 20:1-17.

[146] Tr. 20:9-17; Tr. 30:24-31:1.

[147] Tr. 33:3-5 (showing that while Trooper Jensen first testified that there was no other reason for the traffic stop, he later testified that the lack of license plates alone would have justified the stop).

[148] Motion at 2.

[149] *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

[150] *Id.* at 827.

[151] *Rodriguez v. United States*, 575 U.S. 348, 355-56 (2015); *see also id.* at 356 (contrasting similar, passing questions with a dog sniff, which was not reasonable without additional justification).

[152] *United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005).

detention must also be reasonable, and may not extend beyond the reasonable time required to confirm or dispel the officer's reasonable suspicion.[153]

Accordingly, the question here is not simply whether Jensen had reasonable suspicion by the end of the stop, but whether he had sufficient reasonable suspicion along the way to justify prolonging detainment further. Here, Jensen's traffic stop and subsequent detainment spans 54 minutes, from 9:44 a.m. to 10:38 a.m. The stop can be split up into three different segments: (1) Trooper Jensen's traffic stop, (2) subsequent investigation, and (3) the dog sniffs. Each of these segments are analyzed below.

**Trooper Jensen's traffic stop: 9:44 a.m. to 10:11 a.m.**

From 9:44 a.m. to 10:11 a.m., Trooper Jensen approached the vehicle, asked questions reasonably related to the traffic stop, and by 9:52 a.m., Jensen had discovered sufficient articulable facts to have a reasonable suspicion of criminal activity independent from the initial speeding violation. Below is an account of what took place during this period of time.

At 9:44 a.m., Jenson approached the truck and noticed that the truck was pulling a trailer which held a BMW car, and that none of these three vehicles had license plates.[154] He also noticed a plastic tote on top of the BMW.[155] One minute later, Ms. Wilmoth produced her driver's license and Jensen took down the information on his notepad.[156] Jenson asked who

---

[153] *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985) (examining "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant").

[154] Tr. 27:20-23; Video, Exh. 1 at 9:44:58 a.m.

[155] Tr. 34:10-14.

[156] COVID protocol required Jensen to copy down the driver's license and vehicle information onto a notepad, adding several minutes onto the normal duration of a routine traffic stop. Tr. 34:10-14.

owned the truck, and Garth said it belonged to his friend Tim, who was in the process of registering it in Oregon, but there was a backlog due to COVID-19.[157]

At 9:46 a.m., Jensen asked if the California address on Wilmoth's license was current; she said "yes."[158] Jensen asked about their destination and purpose of travel.[159] Garth said they were going to Salt Lake City to deliver the BMW.[160] Jensen then asked who owned the trailer and if it was registered.[161] Garth replied that it was his, but that it was not registered.[162] At 9:47 a.m., while Garth looked for the paperwork, Jensen discussed the speeding violation with Ms. Wilmoth.[163] During this time, Jensen also asked whether they had any paperwork on the BMW.[164] At 9:48 a.m., Garth provided proof of insurance on the truck.[165]

At 9:49 a.m., Jensen asked, "if you guys live in California, how'd you get his truck in Oregon?"[166] Garth said he got it for a job.[167] Jensen "found it odd that a person would allow a friend to drive an unregistered vehicle from California to Utah."[168] At this point, Jensen thought, "I might have a stolen vehicle."[169] He also took note of the plastic tote on top of the BMW,

---

[157] Tr. 28:17-29.

[158] Video, Exh. 1 at 9:45:17 a.m.

[159] Id at 9:46:14 a.m.

[160] Tr. 29:13-18.

[161] Video, Exh. 1 at 9:46:38 a.m.

[162] Id.

[163] Video, Exh. 1 at 9:47:00 a.m.; Tr. 30:14-21.

[164] Id.

[165] Video, Exh. 1 at 9:48:06 a.m.; Tr. 30.

[166] Id. at 9:49:03 a.m.

[167] Id.

[168] Tr. 32:10-18.

[169] Tr. 33:25-34:1-5.

which he found suspicious because he "had past seizures where the contraband was concealed inside the roof topper."[170] Jensen then took down Garth's driver's license information.[171]

At 9:50 a.m., Jensen asked where in Salt Lake they were delivering the BMW.[172] Garth replied he "hadn't pulled the address up yet."[173] Jensen said he found this suspicious since they were less than an hour away from Salt Lake City.[174] Garth searched for the address on his phone, sitting back and holding the phone at an angle that Jensen would not be able to see.[175] At 9:52 a.m., Garth produced an address: "1748 D Street South Tahoe."[176] Jensen repeated out loud, "South Tahoe?"[177] Jensen believed this was a "false address,"[178] and testified, "if it was me delivering a vehicle to somewhere I would know where the location was for GPS purposes before I left," and "he is a short distance from the destination."[179] Jensen also testified that after living in Utah "all his life," he believed a normal Utah address would be something like "1748 North, South, East, West D Street," reflecting Utah's grid-like address system.[180] This address raised Jensen's suspicion, indicating "they didn't want me to know their destination."[181]

---

[170] Tr. 34:10-14.

[171] Video, Exh. 1 at 9:49:25 a.m.

[172] Tr. 31:2-12.

[173] Tr. 35:9-10; Video, Exh. 1 at 9:50:07 a.m.

[174] Tr. 35:10-11.

[175] Tr. 35:7-22.

[176] Tr. 35:12-18.

[177] Video, Exh. 1 at 9:52:50 a.m.

[178] Tr. 36:12.

[179] Tr. 36:2-5.

[180] Tr. 36:6-12; Tr. 37:17-22.

[181] *Id.*

At 9:53 a.m., Jensen returned to his patrol vehicle to run the VIN number on the truck, as well as Garth's driver's license.[182] At 10:01 a.m., Jensen returned to the truck to confirm its VIN.[183] Jensen asked Garth again who owned the truck,[184] and Garth provided a name and a phone number.[185] Jensen then informed Garth that the truck was not in the process of being registered in Oregon or California.[186] At 10:04 a.m., Jensen returned to his patrol vehicle, ran the VIN a second time, and completed a citation for Ms. Wilmoth.[187] At 10:09 a.m., Jensen printed the citation and returned to the truck, and explained to Wilmoth that he was citing her for speeding and a vehicle registration violation.[188] At 10:11 a.m., Jensen handed the citation to Ms. Wilmoth.[189]

Defendants make two main arguments considering this period of time. First, Defendants argue that Jensen failed to "diligently pursue issuing a citation" by "questioning the travelers about where they were going - including the specific address - and why."[190] The Tenth Circuit has held that an officer may "inquire about the driver's travel plans" and "ask about matters unrelated to the stop"[191] if it does not extend the detention beyond the time reasonably required

---

[182] Video, Exh. 1 at 9:53:25 a.m.

[183] *Id.* at 10:01:11 a.m.

[184] *Id.* at 10:02:31 a.m. ("Whoever owns it is registering it in Oregon?"); *see also id.* at 10:02:34 a.m. ("Do you have a name for [the owner] and a phone number?").

[185] *Id.* at 10:02:37 a.m. (providing the name of the owner); *id.* at 10:03:29 a.m. (providing the phone number)

[186] *Id.* at 10:03:01 a.m. ("I've ran it through . . . and it doesn't show that it's anywhere in the process [of being registered]."); Tr. 38:3-13.

[187] Tr. 39:14-17.

[188] Video, Exh. 1 at 10:09:18 a.m. (printing citation); *id.* at 10:09:48 a.m. (returning to the truck); *id.* at 10:09:52 a.m. (explaining the citation to Ms. Wilmoth).

[189] *Id.* at 10:11:26 a.m.

[190] Motion at 17-18; Reply at 2 ("Instead of diligently pursuing the issuance of a citation, Trooper Jensen spent several minutes questioning the travelers about matters unrelated to the purpose of the traffic stop.").

[191] *Pettit*, 785 F.3d at 1374; *see also United States v. Cone*, 868 F.3d 1150, 1154 (10th Cir. 2017) (finding questions regarding travel plans and identity reasonable); *United States v. Morgan*, 855 F.3d 1122, 1126 (10th Cir. 2017) (holding officer's questions regarding identity did not exceed the scope of a Terry stop); *but see Rodriguez v. United*

to effectuate its purpose.[192] Here, Jensen initially asked two questions about Defendants'

destination.[193] The first came at 9:46 a.m. while Jensen was simultaneously writing down

information from Ms. Wilmoth's license.[194] The second came at 9:47 a.m. while Garth was

searching for paperwork on the truck.[195] Jensen asked these questions within minutes of his

arrival, and testified that the average time for completing a traffic stop post-COVID was beyond

the normal 12 minutes.[196] These questions did not extend the detention beyond the time

reasonably required to effectuate the purpose of the initial traffic stop; they were safely within

the time justified by the initial violation.[197]

Second, Defendants argue that Jensen lacked the requisite diligence because it took ten

minutes to run Garth's driver's license and roughly 24 minutes to issue the citation.[198] A 24-

---

*States*, 575 U.S. 348, 355-56 (2015) (contrasting similar, "unrelated" questions with a dog sniff, which was found to be not reasonable without additional justification).

[192] Defendants argue that this Tenth Circuit precedent has been called into question by a Supreme Court case, *Rodriguez v. United States*, 575 U.S. 348 (2015). Reply at 6-7. However, *Rodriguez* only holds that similar, unrelated questions must not extend beyond the time reasonably required to effectuate the purpose of the stop. *Rodriguez*, at 348. Here, as described below, Jensen's questions did not extend the stop beyond that time.

[193] Video, Exh. 1 at 9:46:15 a.m. ("Where you guys headed?"); *id.* at 9:47:16 a.m. ("So where are you delivering the car in Salt Lake?"). While Mr. Garth answered the first question, he did not appear to answer the second, more specific question. *Id.* Thus, at 9:50 a.m., Trooper Jensen asked a follow-up to the second inquiry: "Where is it you're taking it? . . . Where at in Salt Lake?" *Id.* at 9:50:01 a.m.

[194] *Id.* at 9:46:15 a.m.

[195] *Id.* at 9:47:16 a.m.

[196] Tr. 100:3-9.

[197] In addition, Jensen's questions were related to the facts before him at the time. By 9:44 a.m., he had noted three missing license plates, as well as the plastic tote on the BMW, which he called "very suspicious." Tr. 49:2-3. Garth had also told Jensen that the truck did not belong to him, and that it was in the process of being registered. Thus, by 9:46 a.m. when he first asked where they were headed, Jensen had already come across several facts that would eventually lead to his reasonable belief that there was a "possible stolen vehicle." Tr. 33:22-23. These facts were reasonably related to Jensen's destination-related questions. Additionally, by 9:50 a.m. when Jensen asked the follow-up question, he had noted the plastic tote was suspicious because in past seizures he had seen people conceal contraband in similar roof toppers. Tr. 34:10-14. He had also noted Garth's initial inability to find paperwork on the vehicles, which further solidified his belief that he "might have a possible stolen vehicle." Tr. 33:22-34:5.

[198] Motion at 18 ("Jensen did not even run Mr. Garth's driver's license until 9:57 a.m., more than ten minutes after the traffic stop began [and] completed a citation for Ms. Wilmoth, which he printed at approximately 10:09 a.m. . . . approximately 24 minutes after Ms. Wilmoth displayed her driver's license.").

minute traffic stop is likely outside the amount of time normally taken to conduct a routine traffic stop, according to Trooper Jensen.[199] But, as described above, Ms. Wilmoth's traffic violation was not the only justification Jensen had developed during this initial span of time.[200]

By 9:52 a.m., eight minutes after the stop began, Jensen had come across a number of facts that resulted in his reasonable suspicion of criminal activity. Jensen had seen that none of the vehicles had license plates,[201] and that the BMW had a tote similar to those he had seen carrying contraband.[202] Garth had told Jensen the truck was not registered in his name, but that it belonged to his friend who was in the process of registering it in Oregon;[203] Garth told Jensen a story about going all the way from California to Oregon to borrow the truck for a job, and then using the same truck to transport and deliver the BMW to some "business" in Salt Lake City, Utah.[204] Then Garth spent over two minutes[205] on his phone searching for the delivery address, holding the phone away from Jensen's view, and only to provide an address that to Jensen, a life-long Utah resident, did not reflect Utah's grid system.[206] Jensen believed Garth had given him a "false address," and that "they didn't want me to know their destination."[207] The court finds that

---

[199] Tr. 100:3-9 (Q: "[W]hat is the average time, if there is one, for completing a process of pulling somebody over, um, getting their license, getting their insurance, obtaining their registration, giving their ticket…." A: "[P]re-COVID I would say was probably about 12 minutes. COVID area [sic] it has extended a little bit.").

[200] *See Pettit* at 1379 (finding that continued detention is lawful "if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity").

[201] Tr. 27:20-23.

[202] Tr. 34:10-14.

[203] *Id.*

[204] Tr. 36:6-12; Tr. 37:17-22.

[205] Garth began searching for the destination address at 9:50:17 a.m., and provided the address to Trooper Jensen at 9:52:36 a.m., taking a total of 2 minutes and 19 seconds. Video, Exh. 1.

[206] Tr. 36:14-15 ("I'm familiar with Utah addresses, I have lived here all my life."); Tr. 36:15-20 ("It's based on a grid system. The 1748 would have been in the middle of the block, half way between 16 and 18 -- or 17 and 18 or 16 depending on which direction on the street it was. So a normal address in this situation, with this address, to me would have been 1748 North, South, East, West D Street.").

[207] *Id.*

the totality of these facts are sufficient to support reasonable suspicion of criminal activity. Additionally, by 10:11 a.m., Jensen had run a search on the truck VIN number,[208] which revealed that the truck was not in the process of being registered in Oregon or California, contrary to what Garth had previously told him.[209] Jensen "found it odd that a person would allow a friend to drive an unregistered vehicle from California to Utah," and that this type of "third-party vehicle" was a "possible indicator of criminal activity."[210] This lent further support for an officer in Jensen's position to believe there was criminal activity[211] and justified prolonging detention beyond the point at which he handed Ms. Wilmoth the citation (10:11 a.m.) to determine whether there was in fact a stolen vehicle and/or contraband.[212]

**Trooper Jensen's subsequent investigation: 10:11 a.m. to 10:23 a.m.**

From 10:11 a.m. to 10:23 a.m., Trooper Jensen continued investigating, which led him to additional evidence of criminal activity, which justified extending detention during this period of time. At 10:12 a.m., Jensen asked who owned the BMW and whether Garth had access to the plastic tote.[213] Garth said it did not belong to him and that he did not have keys to the tote or the

---

[208] Video, Exh. 1 at 9:53:25 a.m.; *see also* Tr. 38:3-13 (describing that Jensen went back to confirm the VIN number a second time and ran an additional search to double-check that it was not in the process of being registered).

[209] *Id.* at 10:03:01 a.m. ("I've ran it through . . . and it doesn't show that it's anywhere in the process [of being registered].") ; Tr. 38:3-13.

[210] Tr. 32:10-18.

[211] Tr. 38:3-13.

[212] *See id.* Defendants also contend that Trooper Jensen "prolonged the detention in an attempt to manufacture probable cause," citing to testimony on the interdiction project and Jensen's cross-examination where he admits to "trying to develop some suspicion or reasonable suspicion." Motion at 15-16. Defendants argue this shows that his only purpose in the stop was to obtain reasonable suspicion and interdict criminals. *Id.* But, aside from the fact that Jensen's own testimony contradicts this interpretation, *see* Tr. 74:20-24, the standard does not look to subjective intent but "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Terry v. Ohio*, 392 U.S. at 21–22. Here, as described above, the facts available to Jensen warranted prolonging detainment to investigate his reasonable suspicion.

[213] Video, Exh. 1 at 10:10:40 ("Whose car is that? Does that belong to you, James?"); Video, Exh. 1 at 10:11:23 ("Do you have access to the tote on top?"); Tr. 41-42.

car.[214] Jensen found it suspicious that he did not have keys to the very items being sold.[215] Jensen

responded, "let's go back and … find the VIN."[216] Garth tried three times to read Jensen the VIN

but was "unable," so Jensen recorded it himself.[217] Based on his training and experience, Jensen

said this indicated "nervous" behavior.[218] Jensen also found it suspicious that the tote was "of

newer condition" compared to the damaged condition of the BMW.[219] At 10:13 a.m., Jensen

asked Garth if he could "jump up and look at" the plastic tote, and Garth said, "sure."[220] Jensen

stepped up on the trailer and confirmed that the tote was locked, but was able to stick his hand

between the lids and feel an object inside.[221] Jensen found it suspicious that the car was being

sold for parts but had a tote that still contained belongings.[222]

At 10:14 a.m., Jensen requested that Trooper West and Sgt. Wood respond because "I

believe[d] I had criminal activity taking place. I didn't know if it was a stolen vehicle. I didn't

know if there was illegal substances being transported."[223] Sgt. Wood estimated he was

"probably 20 miles away."[224] While Jensen waited for backup, he ran the VIN for the BMW, and

found that the title was transferred to Garth in 2015.[225] This was inconsistent with Garth's

---

[214] Tr. 41:10-20.

[215] Tr. 41:16-17.

[216] Video, Exh. 1 at 10:11:26 a.m.; Tr. 84:8-15.

[217] Tr. 43:1-10.

[218] Tr. 43:13-17.

[219] Tr. 44: 2-8.

[220] Video, Exh. 1 at 10:13:31 a.m.

[221] Tr. 44:25-45:5.

[222] Tr. 45:17-19.

[223] Tr. 45:21-46:1.

[224] Tr. 122:9-12.

[225] Tr. 85:5-23.

statement that the BMW did not belong to him and that he did not have keys.[226] At 10:17 a.m., Jensen asked Garth who was paying him to deliver the vehicle.[227] Garth said he did not know, but then seconds later gave the name, "Brittany Keen," and provided her phone number.[228] Jensen also asked how much he was being paid and Garth repeated, $500.[229] Jensen believed this was "a false story" because "nothing that he had told me from the beginning was matching up to what was at hand."[230] At 10:18 a.m., Jensen asked Garth again for the delivery address, and Garth said, "I don't remember the address" and that "it's in the car."[231] Jensen found this "very suspicious" because Garth had previously retrieved the address from his phone, which was still in his hand.[232] At 10:20 a.m., Jensen searched Garth to make sure he did not have any weapons,[233] and began preparing to deploy his canine for an exterior sniff of the vehicle.[234]

Defendants argue that Trooper Jensen unreasonably "extend[ed] the detention to wait for Sergeant Wood."[235] However, by 10:14 a.m. when Jensen decided to request backup, he had come across additional facts supporting his reasonable suspicion of criminal activity, including: Garth told Jensen the BMW did not belong to him and that he did not have keys to the tote or the car, which Jensen found suspicious because the car was being delivered to someone in Salt Lake;[236] Garth displayed "nervous" behavior, failing three times to read Jensen the VIN on the

---

[226] Tr. 46:22-47:2.

[227] Tr. 47:5-10.

[228] *Id.*

[229] Tr. 47:13-21.

[230] Tr. 48:1-4.

[231] Tr. 48:4-6.

[232] Tr. 48:4-10.

[233] Video, Exh. 1 at 10:20:13 a.m.; Tr. 48:22-49:9.

[234] *Id.*

[235] Motion at 19.

[236] Tr. 41:10-20.

BMW;[237] the VIN revealed that the BMW title was transferred to Garth in 2015, which was contrary to Garth's statement that he did not own the car and did not have keys;[238] Jensen felt an object inside the tote,[239] which he found suspicious that the car being sold for parts had a tote that still contained belongings.[240] These facts, in addition to all other facts available to Jensen, justified his continued detention and investigation, including his request for assistance from Sgt. Wood.[241]

Defendants argue that Jensen impermissibly extended detention by having Drago perform a sniff "even though there was no evidence that controlled substances were present."[242] Defendants cite to Jensen's testimony on cross-examination where he was asked whether he performed the dog sniff "even though [he] had not observed anything of controlled substances, smelled anything, whatever, [he's] still going to pull a dog out and have them search the car."[243]

---

[237] Tr. 43:13-17.

[238] Tr. 43:1-10.

[239] Tr. 44:25-45:5.

[240] Tr. 45:17-19.

[241] Defendants also argue that, by this point, Jensen's initial suspicion of a stolen vehicle was dispelled because he had discovered that the BMW belonged to Garth after running its VIN through a search. Motion at 19. However, on top of the growing list of contradictions in Garth's story, Jensen had an independent suspicion that the plastic tote contained contraband, which would eventually lead him to conduct a dog sniff. Tr. 34:10-14. Also, the BMW was not the only vehicle that was potentially stolen. After Garth told Jensen that the pickup truck was not his, but that he borrowed it from a friend in Oregon who was in the process of registering it, Jensen ran searches in both California and Oregon, and neither showed that the truck was in the process of being registered. Tr. 29:8-10; Tr. 38:12-13.

[242] Motion at 19.

[243] Motion at 19-20; Tr. 89:25-90:12. Defendants also cite to Jensen's affirmative response to a similar question: "What, in effect you're doing by bringing the dog out, at that point, in my words . . . it's a fishing expedition, you're looking to see whether you can find something, correct?" Motion at 20; Tr. 89:25-90:12. However, it is not as if Jensen was out there "fishing" without reasonable suspicion that the proverbial pond contained "fish." As illustrated above and throughout this order, Jensen had come across numerous articulable facts that supported a reasonable suspicion that Defendants possessed contraband and/or a stolen vehicle.

Jensen answered, "yes."[244] However, Jensen had in fact obtained evidence that controlled

substances were present, which justified extending detainment for Drago's dog sniff.[245]

By 10:23 a.m., when Trooper Jensen began preparing to deploy his canine for a sniff

around the vehicles, Jensen had already come across more facts which bolstered his reasonable

suspicion: Garth had told Jensen that he did not know who was receiving the BMW, but then

seconds later provided a name and phone number;[246] when Jensen asked again about the delivery

address, Garth said, "I don't remember" and that "it's in the car,"[247] but Garth had previously

retrieved the address from his phone, which was still in his hand;[248] Jensen had also completed a

simple Google search for the address that Garth had given him, but could not find any address by

that name in Salt Lake City.[249] Jensen believed Garth's entire account was a "false story"

because "nothing that he had told me from the beginning was matching up."[250] These facts,

weighed together with the totality of the evidence available to Trooper Jensen at this time,[251]

amount to a reasonable suspicion that Defendants possessed contraband, justifying extending the

stop to conduct a dog sniff around the vehicles.

---

[244] Tr. 90:12.

[245] Trooper Jensen later laid out a long list of facts that led him to believe Defendants possessed contraband, which included: the truck was an unregistered vehicle pulling an unregistered trailer which held another vehicle; the truck "was a third-party vehicle, which due to training and experience is a possible indicator of criminal activity;" he had seen similar plastic totes from past seizures that carried contraband, and this one held an object inside of it; the unusual nature of the address, the failure to confirm the address; Google search confirming that the address was nonexistent; Garth's nervousness when asked to provide the VIN; the expired registration on the BMW; Garth had told Jensen he did not own the BMW, but a search revealed Garth to be "the last person that had ownership of it;" Garth told Jensen he did not know to whom he was delivering the car or who paid him to do so, but then within ten seconds provided a name and phone number. *See* Tr. 49:21-51:5.

[246] *Id.*

[247] Tr. 48:4-6.

[248] Tr. 48:4-10.

[249] Tr. 50:3-5.

[250] Tr. 48:1-4.

[251] Reasonable suspicion takes into account the "totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

**Dog Sniffs: 10:23 a.m. to 10:38 a.m.**[252]

From 10:23 a.m. to 10:38 a.m., the officers conducted two dog sniffs resulting in positive indications that drugs were present, which justified the remaining duration of time Defendants were detained. At 10:23 a.m., Jensen deployed his canine, Drago.[253] When Drago went near the rear of the trailer, Jensen noticed Drago alert, and then later saw Drago give a positive indication near the bumper of the truck.[254] At 10:25 a.m., Jensen returned Drago to the patrol vehicle.[255] At 10:29 a.m., Jensen and Trooper West searched the cab of the pickup and found a BMW key, BMW title and registration, and other keys on a key ring.[256] They also searched the bed of the truck, a found brand-new bolts attaching a worn gas tank, and tools with similarly sized bolt attachments.[257] This suggested that the fuel tank might have been recently replaced and that might have been the source of the odor to which the dog indicated.[258]

At 10:33 a.m., Sgt. Wood arrived,[259] and at 10:35 a.m., Jensen briefed him, recounting that Drago "indicated on the truck," "alerted on the back part of the trailer," "but he's having a hard time getting up on the trailer to get good sniff of the car."[260] Jensen asked whether he could search the BMW from the alert on the truck, and wondered if Wood wanted to deploy his canine, "Axel," out of an abundance of caution.[261] Sgt. Wood agreed to run Axel for an additional

---

[252] More facts pertaining to the dog sniffs are analyzed below under the section discussing reliability. The section here specifically analyzes the duration of time that Defendants were detained during this period of time.

[253] Tr. 57:23-58:1.

[254] Tr. 58:1-7.

[255] Video, Exh. 1 at 10:25:41 a.m.

[256] Tr. 63.

[257] Tr. 63:14-64:5.

[258] *Id.*

[259] *Id.*

[260] Video, Exh. 1 at 10:35:30 a.m.

[261] *Id.*; Tr. 64:6-16; Tr. 123:4-18.

sniff.[262] At 10:37 a.m., Wood ran Axel around the car, and at 10:38 a.m. Axel "jumped up on the trailer and gave a positive indication."[263] At this point, Jensen opened the trunk of the BMW and found that it was filled with marijuana.[264] Jensen said, "let's hook him."[265] In addition to the trunk, the plastic tote was opened and contained marijuana.[266]

By 10:33 a.m., Jensen had noticed additional facts that significantly bolstered his suspicion and justified the continuation of Defendants' detention: he had seen Drago alert near the rear of the trailer, and give a positive indication near the truck bumper;[267] inside the truck, he found a BMW key, which Garth had previously told him that he did not have; he had also found the BMW title and registration, which again went against Garth's story that he did not own the BMW;[268] in the truck bed, Jensen had seen brand-new bolts attaching a worn gas tank, and tools with similar bolt attachments, which looked like the fuel tank had been recently replaced, and which was in the same area where Drago had given a positive indication.[269] These facts, in addition to all other previous facts, justified extending the duration of the detention. This was only further solidified five minutes later when Sgt. Wood's canine Axel "jumped up on the trailer and gave a positive indication."[270] After these positive indications, Jensen was certainly

---

[262] Video, Exh. 1 at 10:36:35 a.m.

[263] Tr. 64: 19-25.

[264] Tr. 66.

[265] Video, Exh. 1 at 10:38:44 a.m.

[266] *Id.*

[267] Tr. 58:1-7.

[268] Tr. 63.

[269] Tr. 63:14-64:5.

[270] Tr. 64:19-25.

justified to open the trunk, which revealed marijuana, as well as open the plastic tote, which also contained marijuana.[271]

Overall, the duration of Trooper Jensen's initial traffic stop from 9:44 a.m. to 10:11 a.m., his subsequent investigation from 10:11 a.m. to 10:23 a.m., and the dog sniffs from 10:23 a.m. to 10:38 a.m. were each individually justified by articulable facts leading to a reasonable suspicion of criminal activity. Nothing in the record shows that detention lasted longer than was necessary to effectuate the purpose of dispelling or confirming that suspicion.[272]

## II.    Reliability of Dog Sniffs

Defendants argue that both Drago and Axel's sniffs were unreliable and thus did not provide probable cause to search the vehicles.[273] In the Tenth Circuit, reliability of a dog alert is "normally, though not exclusively, established by presenting evidence regarding the canine's training and certification."[274] Additionally, "[a] party seeking to suppress evidence bears the burden of proving the dog is unqualified."[275] Here, both canines (Drago and Axel) and their handlers (Trooper Jensen and Sgt. Wood) were fully certified at the time of arrest.[276]

---

[271] Tr. 66.

[272] *United States v. Morales*, 961 F.3d 1086, 1091 (10th Cir. 2020).

[273] Motion at 20.

[274] *United States v. Bertram*, 307 F. App'x 214, 215 (10th Cir. 2009) citing *United States v. Clarkson*, 551 F.3d 1196, 1204-05 (10th Cir. 2009); *see also United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) ("[W]ith a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill.").

[275] *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

[276] Tr. 15:15-16; Tr. 54:19-24; 52:12- 20; Gov. Ex. 2; 119:5-13; Gov. Ex. 4; Gov. Ex. 5.

**Drago**

At the time of the dog sniff, Drago was certified by POST and Jensen was certified as a

canine handler.[277] During the course of the interdiction project, Drago had been deployed four

times, and found drugs three times; Drago indicated on the fourth, but no illegal substances were

found.[278] The fourth sniff involved a rental car, which was previously rented by an unknown

occupant.[279] Jensen has been Drago's handler since February of 2020.[280] Prior to that, Trooper

Loveland had Drago for about five years.[281]

At 10:23 a.m., Jensen deployed Drago, who started his sniff at the back of the trailer, then

up the left side to the front of the pickup truck.[282] Jensen then gave his command to find drugs,

and Drago reversed his direction and started sniffing down the driver's side of the truck, down

the left side of the trailer to the rear of the trailer.[283] At this point, Jensen noticed Drago alert to

an odor.[284] Drago continued around the trailer and the truck, then "went in between the trailer

and the truck, the tongue hitch."[285] At 10:25 a.m., Drago stopped at the pickup truck bumper, and

Jensen said, "good boy, where is it?"[286] "Drago put his front paws up on the bumper of the

pickup truck and gave a positive indication" of "[i]llegal substances."[287] Jensen described this

---

[277] Tr. 15:15-16; Tr. 54:19-24; 52:12-20; Gov. Ex. 2.

[278] Tr. 54:3-15.

[279] Tr. 54:14-18.

[280] Tr. 92:21.

[281] Tr. 93:4-6.

[282] Tr. 57:23-58:1.

[283] Tr. 58:1-7.

[284] Jensen defined "alert" as "behavior that not everybody would note, but me as a handler, knowing his behaviors, would know when he is in the odor." Tr. 59:21-23. In contrast, a "positive indication would be a behavior noted in the dog that somebody outside of the handler would recognize as him finding the odor." Tr. 59:8-10.

[285] Video, Exh. 1 at 10:25:10 a.m.

[286] *Id.*

[287] Tr. 61:16-25.

behavior as a being "frozen in stature, staring at a certain location where the odor is coming from."[288] At this point, Jensen said, "good boy, good boy," tossed Drago some sort of toy,[289] and then returned Drago to the patrol vehicle.[290]

Defendants argue that Drago's indication was unreliable because drugs were not found after his fourth indication on the interdiction project.[291] Defendants also ask this court to "take judicial notice of a published opinion from this jurisdiction:" *United States v. Esteban*, 283 F.Supp.3d 1115, 1131 (D. Utah, 2017). According to Defendants, the canine in *Esteban* is the same Drago here, and the evidence in *Esteban* established that "Drago had numerous false alerts around the relevant time."[292] Defendants did not develop this evidence at the evidentiary hearing. Also, the relevant question for the court is not what was found in another case, because this court has none of that evidence before it.

What is before the court is the fact that Drago was fully certified at the time of the dog sniff, and that Drago may have given one false indication over the course of the interdiction project.[293] Here, even if the record definitively proved that Drago's fourth deployment was a "false indication," a perfect detection rate is not required to establish dog-sniff reliability.[294] Given Drago's certification, and the absence of record evidence proving his unreliability at the

---

[288] Tr. 62:13-20.

[289] Video, Exh. 1 at 10:25:17 a.m.

[290] *Id.* at 10:25:41 a.m.

[291] Motion at 20. Tr. 18:9-13; Tr. 54:3-15.

[292] Motion at 20-21.

[293] Tr. 15:15-16; Tr. 54:19-24; 52:12- 20; Gov. Ex. 2; 119:5-13; Gov. Ex. 4; Gov. Ex. 5.

[294] *See United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) ("We find that a 70-80% success rate meets the liberal standard for probable cause[.]"); *United States v. Bertram*, 307 F. App'x 214, 217 (10th Cir. 2009) (finding an indication reliable where the canine's record included five false alerts); *see also United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (recognizing that a dog's "alert ... does not implicate the precision of a surgeon working with scalpel in hand," and that probable cause does not require such exaction).

time of this search, Drago's sniff and subsequent indication were sufficiently reliable to establish a "fair probability that contraband or evidence of a crime" would be found in the BMW.[295]

Defendants also contend that Jensen was "cuing" Drago in an unnecessarily suggestive manner by saying, "good boy, where is it?" and "appear[ing] to present Drago with a toy."[296] It is true that the body-camera footage shows Jensen say the above-mentioned phrase and he appears to throw Drago the toy after Drago had placed his paws on the truck bumper and had given "a positive indication."[297] But outside Defendants' own interpretation of the footage, Defendants present no basis for their interpretation, nor expert testimony on the subject, and Jensen's testimony does not support Defendants' view. Nothing in this sequence suggests that Drago's indication was invalidated by Jensen's actions. Drago's indication was reliable.

**Axel**

Sgt. Wood was certified to be a canine handler in 2012, and his canine Axel was certified in May 2020.[298] At 10:35 a.m., Trooper Jensen briefed Sgt. Wood, asked whether he could search the BMW from the alert on the truck, and wondered if Wood wanted to deploy Axel out of an abundance of caution, not knowing the legalities of the situation.[299] Wood agreed to run Axel for an additional sniff.[300] Sgt. Wood testified that he deployed Axel not because there was a concern as to Drago's reliability, but out of an abundance of caution.[301]

---

[295] *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

[296] Tr. 61:16-25. Defendants also note that "the dog traveling with Garth and Wilmoth was in the bed of the pickup truck at the inception of the traffic stop," and that "[a]ny lay person familiar with dogs would confirm that dogs pick up on the scent of other dogs." Motion at 21. However, outside of Defendants' own opinion on this point, nothing in the record confirms or sheds any light on the influence of another dog's scent on Drago's ability to detect drugs.

[297] Tr. 61:16-25.

[298] Tr. 115:14-15; Tr. 119.

[299] *Id.*; Tr. 64:6-16; Tr. 123:4-18.

[300] Video, Exh. 1 at 10:36:35 a.m.

[301] Tr. 123:4-18.

At 10:37 a.m., Sgt. Wood ran Axel around the car, and at 10:38 a.m., Axel "jumped up on the trailer and gave a positive indication."[302] On cross-examination, Wood was asked whether Axel ever wanted his toy so bad that he might employ a confirmatory response just to get his toy, when there are no drugs present.[303] Wood responded, "The dog is very reliable … I don't think is he going to try to cheat to get the toy, no."[304]

Defendants argue that Axel's indication was not reliable because "there is evidence that Axel effectively 'trained' his handler, which subverts the ostensible scientific methodology of drug detection by K9s."[305] Defendants cite Sgt. Wood's testimony on cross-examination, where Wood explained how Axel shows him that he found drugs.

> He is a passive dog which by POST standards is sit/stand, freeze, or lay down. But the front of the car to the rear of the trailer was only about 18 inches or 2 feet and it seemed like it was probably an uncomfortable position for him. So therefore he stood. And then after he got frustrated because he didn't see the toy coming in, that's when he began to bark.[306]

Defendants contend that "Wood subjectively interpreted Axel's response . . . and started displaying a response which is apparently contrary to his training" by barking.[307] However, Defendants failed to present any evidence on what constitutes "ostensible scientific methodology of drug detection," or how Axel's behavior did not fit within it. Sgt. Wood explained that Axel indicates via "*sit/stand*, freeze, or lay down," which is exactly what Axel did: "[H]e just *sat* up."[308] Regardless of what Axel was doing prior to his final indication in response to the difficult

---

[302] Tr. 64:19-25.

[303] Tr. 131:7-10.

[304] Tr. 131:11-13

[305] Motion at 22.

[306] Tr. 124:20-125:10.

[307] Motion at 23.

[308] Tr. 124:16-17 (emphasis added); *see also* Tr. 124:24-125:1 ("So therefore he stood.").

footing of the trailer, Sgt. Wood clearly described that Axel performed his POST-trained indication of stopping in one place and sitting up.[309] According to Sgt. Wood, Axel began to bark after giving his positive indication "because he didn't see the toy coming."[310] However, regardless of Axel's actions *after* the indication, Axel gave a positive indication before barking. In addition, Wood was asked whether Axel ever wanted his toy so bad that he might employ some of the confirmatory responses that could be for controlled substances but are actually for his toy.[311] Wood responded, "The dog is very reliable … I don't think is he going to try to cheat to get the toy, no."[312]

The facts demonstrate that both Axel and Sgt. Wood were certified, and that Axel gave a positive indication for drugs by sitting/standing and freezing. Thus, regardless of Axel's bark or Sgt. Wood's interpretation of its meaning, Defendants have not undermined the reliability of Axel. Overall, given the certifications of Axel and Drago and their handlers, and the lack of evidence undermining the positive indications provided by both canines, as well as the absence of any evidence of unreliability, the canine sniffs in this case were reliable.

In conclusion, the traffic stop and subsequent detainment effectuated by Trooper Jensen were reasonable under the Fourth Amendment. At each extension of Defendants' detention, Trooper Jensen had reasonable suspicion of criminal activity which justified each extension of time. This reasonable suspicion also justified the canine sniffs, which yielded positive indications of illegal substances, leading the officers to probable cause to search the vehicles. Trooper Jensen's actions, along with the actions of the other officers, were reasonable and did not violate

---

[309] *Id.*

[310] Tr. 124:20-125:10.

[311] Tr. 131:7-10.

[312] Tr. 131:11-13.

Defendants' Fourth Amendment rights. Therefore, the evidence obtained as a result of these actions is not suppressed.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Suppress is DENIED.

Signed July 28, 2021.

BY THE COURT

_____
David Barlow
United States District Judge